

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 26, 2020

**BY ECF**
The Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Mones Coro*, 19 Cr. 144 (AKH)

Dear Judge Hellerstein:

    The Government writes in opposition to defendant Victor Mones Coro's bail application filed on March 25, 2020 (Dkt. No. 65). As detailed below, the defendant is not entitled to release because he cannot demonstrate by clear and convincing evidence that he is unlikely to flee. Indeed, the defendant—who has substantial contacts abroad, including citizenship in Spain and Venezuela—has access to millions of dollars, private planes, and has a history of manipulating flight manifests and arranging illicit travel. While the defendant broadly claims he will not flee, he presents insufficient evidence of that, and is not otherwise credible given his prior efforts to deceive law enforcement and coach others to lie—all while carrying out an exceedingly serious offense that Congress has identified as threatening U.S. national security by supporting large scale drug traffickers. 21 U.S.C. § 1901(a)(4). Moreover, the defendant has a significant motivation to flee given the substantial prison sentence he faces, and, as unique to this case, has access to powerful individuals abroad who have an interest in assisting the defendant in fleeing the United States. The defendant's efforts to use the COVID-19 outbreak to justify his release should moreover be rejected. As set out below, there is no legal authority justifying the defendant's release, and the Metropolitan Correctional Center ("MCC"), where the defendant is housed, has undertaken (and continues to undertake) measures to provide the defendant access to his attorney to prepare for sentencing while mitigating the defendant's risk of exposure to COVID-19. Indeed, at least four district courts in this Circuit have, in recent days, rejected similar requests for release. For all of these reasons, the defendant's application should be denied.

## I. Background

### a. The Defendant's Criminal Conduct

Between 2017 and March 2019, the defendant provided private flights and other charter services to designated individuals in violation of the Foreign Narcotics Kingpin Designation Act and the Kingpin Act regulations. Specifically, the defendant operated a company in Florida (American Charter Services) that provided flights and other services to Venezuela's vice president for the economy, Tareck Zaidan El Aissami Maddah, and El Aissami's front man Samark Jose Lopez Bello—each of whom were designated in February 2017 by the Office of Foreign Assets Control ("OFAC") as Specially Designated Narcotics Traffickers. (PSR ¶¶ 16-20).[1] The defendant's co-conspirators include El Aissami, Lopez Bello, and Joselit Ramirez Camacho, who is the current Superintendent of Cryptocurrencies for Venezuela, and who was charged in Superseding Indictment S5 19 Cr. 144 (AKH), unsealed today, and attached hereto as Exhibit A. Of note, El Aissami and Lopez Bello are prominent members of the inner circle of Nicolas Maduro—the de facto leader of Venezuela, who was separately charged before this Court in Indictment S2 11 Cr. 205 (AKH), also unsealed today, with conspiracy to commit narco-terrorism, conspiracy to import hundreds of tons of cocaine into the United States, and related weapons offenses. (Exhibit B; *see also* PSR ¶¶ 22-25).

The defendant provided flight and hangar services to El Aissami and Lopez Bello dating back to at least 2014. (PSR ¶ 27). Following El Aissami and Lopez Bello's designation by OFAC, the defendant worked with others to continue to provide them services in violation of the law. (PSR ¶ 28). In addition to providing international flight services, the defendant and his co-conspirators arranged flights on behalf of El Aissami and Lopez Bello within Venezuela in support of Maduro's 2018 presidential campaign. (PSR ¶ 40). To mask their illicit conduct, the defendant and his co-conspirators used code names to refer to El Aissami and Lopez Bello (PSR ¶ 29); falsified flight manifests and invoices (PSR ¶ 38); and used bulk cash payments transported on planes flown from Venezuela to the United States (PSR ¶ 38). The defendant also directed a member of the conspiracy to lie to law enforcement during the pendency of the investigation. (PSR ¶ 39).

### b. Procedural History

The defendant was arrested in the Southern District of Florida on March 8, 2019 and has been detained since that time. (PSR ¶ 43). On November 26, 2019, the defendant pleaded guilty (PSR ¶ 7) and is scheduled to be sentenced on April 24, 2020.

---

[1] The defendant requests that the Court rely on the Presentence Investigation Report of March 24, 2020 in lieu of a Pretrial Services Report. The Government takes no position on whether a Pretrial Services Report, and a recommendation from Pretrial Services, is necessary to resolve the defendant's bail application.

## II. Discussion

Under Section 3143(a), in light of the defendant's admission of guilt, he has the burden of demonstrating that bail is appropriate. He has not met that burden.

### a. Legal Standard

Because the defendant has been convicted, he has no "substantive constitutional right to bail pending sentencing." *United States v. Madoff*, 316 F. App'x 58, 59 (2d Cir. 2009) (citing *Williamson v. United States*, 184 F.2d 280, 281 (2d Cir. 1950); *United States v. Abuhamra*, 389 F.3d 309, 317 (2d Cir. 2004)). A convicted defendant "is no longer entitled to the presumption of innocence." *Id.* (internal quotation marks omitted). As a result, 18 U.S.C. § 3143(a) "places the burden on a [convicted] defendant to demonstrate by clear and convincing evidence that he is not likely to flee or pose a danger to the safety of others or the community." *Id.* Indeed, Section 3143(a) directs that the Court "*shall* order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence . . . be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released." 18 U.S.C. § 3143(a)(1) (emphasis added).

### b. The Defendant Is Likely to Flee

The defendant's generalized promises not to flee, and his reliance on letters from friends claiming him to be trustworthy, are insufficient to meet his burden here. Indeed, the record demonstrates that the defendant has the incentive, the means, and the relationships to flee.

First, the defendant has substantial financial resources. The defendant holds, at minimum, an incredible $6.8 million in assets, including immediate access to more than $40,000 in cash, a private plane, and a boat. (PSR ¶ 99). The Probation Office concluded that, despite the defendant's claimed liabilities and negative cash flow, he has the ability to pay a fine and that the defendant's financial affidavit, which may have been technically correct at the time of completion, "seemingly underrepresents the defendant's ability to pay a fine." (PSR ¶ 102). Indeed, just weeks ago, the defendant sold one of his residences in Boca Raton for more than $1.7 million, and defense counsel clarified to Probation that certain debts listed on the financial affidavit would not be collected. (PSR ¶ 99 & n.2).

Second, the defendant has substantial foreign contacts, including individuals with significant resources who have an incentive to get the defendant out of the United States to protect themselves against recently announcement charges. While the defendant is a United States citizen, he is also a citizen of Spain and Venezuela. (PSR ¶ 78). The defendant's mother resides in Spain (PSR ¶ 72) and his sister resides in the Spanish Canary Islands (PSR ¶ 73). Although the defendant describes his contacts with the Southern District of Florida, he does not appear to have any ties to the Southern District of New York. *See, e.g.*, *United States v. Lewis*, No. 16-CR-786 (NSR), 2017 WL 6547742, at *3 (S.D.N.Y. Dec. 20, 2017) (defendant lacked community ties where he had "no contacts with the community of New York," among other factors). Moreover, the defendant has relationships with senior Venezuelan officials who have an increasing incentive to assist the

defendant in fleeing the United States. The defendant's charged co-conspirators include El Aissami (the former Venezuelan Vice President and current Minister of Industry and National Production); Lopez Bello (El Aissami's front-man); and, as announced today, Joselit Ramirez Camacho (the current Superintendent of Cryptocurrencies for Venezuela). El Aissami and Lopez Bello are part of the inner circle of the de facto Venezuelan ruler, Nicolas Maduro—who also stands charged in this District. The defendant assisted in providing flights in support of Maduro's most recent campaign, which the Organization of American States concluded "lacked legitimacy" and contributed to "the worsening political, economic, social and humanitarian crisis in Venezuela resulting from the breakdown of democratic order and serious human rights violations."[2] Thus, the defendant's conduct was exceedingly serious, and his conduct in violation of the Kingpin Act worsened the "national emergency resulting from the activities of international narcotics traffickers and their organizations that threatens the national security, foreign policy, and economy of the United States." 21 U.S.C. § 1901(a)(4) (congressional findings underlying the Kingpin Act). ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Third, the defendant has a unique ability to flee. The defendant is an experienced pilot. (PSR ¶¶ 93-94). He owns a private plane (PSR ¶ 99) and has spent years in the aviation industry in the United States, during which time he undoubtedly built a network of associates who also have access to private planes. Moreover, as demonstrated by the offense conduct here for which the defendant stands convicted, the defendant has experience utilizing falsified flight manifests and otherwise masking illicit travel. (PSR 38). These unique circumstances call for continued incarceration in this case. *See, e.g.*, *United States v. Londono-Villa*, 898 F.2d 328, 329 (2d Cir. 1990) (reversing district court's post-conviction order of bail where, *inter alia*, the defendant was a commercial pilot with familiarity with clandestine airstrips who would have "little difficulty and great incentive to hire the use of a plane to fly himself and his spouse" out of the United States).

Fourth, the defendant, at age 52, faces a significant prison sentence. His guilty plea subjects him to a maximum sentence of thirty years' imprisonment, and a Guidelines Range of 70 to 87 months' imprisonment. (PSR at 28). *See United States v. Scali*, 738 F. App'x 32, 33 (2d Cir. 2018) (affirming district court's post-conviction detention order where "[t]he court reasonably determined that [the defendant's] Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee").

The only evidence the defendant provides in support of his bail application are letters from friends and family attesting to his character. This is woefully insufficient to meet his burden of providing clear and convincing evidence in support of his application, and cannot overcome the substantial risk of flight evidence detailed above. In rejecting a similar argument, the Second

---

[2] https://www.oas.org/en/media_center/press_release.asp?sCodigo=E-001/19.

Case 1:19-cr-00144-AKH   Document 71   Filed 03/26/20   Page 5 of 8

Page 5
Circuit has noted, "[w]e fail to see how such subjective assessments can, on their own, satisfy the heightened burden of proof placed on the defendant to establish that he is not likely to flee by clear and convincing evidence, particularly given the not unreasonable presumption that the defendant concealed his criminal activities from his family in the past." *Londono-Villa*, 898 F.2d at 330.

### c. The COVID-19 Pandemic Does Not Warrant Bail

The defendant's arguments concerning COVID-19 also do not warrant his release.

#### i. 18 U.S.C. § 3142(i) Does Not Apply Because the Defendant Is Not Awaiting Trial

The defendant argues principally that he should be released pursuant to 18 U.S.C. § 3142(i). That statute however is inapplicable. The statute expressly applies to "[r]elease or detention of a defendant *pending trial*." 18 U.S.C. § 3142 (section title). Indeed, the statute notes the presumption of innocence to which the defendant is entitled before trial. 18 U.S.C. § 3142(j). The defendant ignores that, once convicted, 18 U.S.C. § 3143 applies, removing the presumption of innocence and placing the burden on the defendant to demonstrate by clear and convincing evidence that he does not present a risk of flight—which, here, he has not done.

While the defendant relies on Judge Nathan's application of 18 U.S.C. § 3142(i) in *United States v. Stephens*, No. 15 Cr. 95 (AJN), 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020), that case is inapposite. *Stephens* involved an alleged violation of supervised release, and so the Court considered the strength of the Government's case and the defendant's need to prepare his defense to the pending supervised release allegations. Here, however, the defendant has been convicted and is facing a substantial prison sentence. Moreover, while Judge Nathan found in *Stephens* that defense counsel had been unable to communicate by phone with the defendant, that is not the case here. (Def. Ltr. at 5 (describing recent phone call with the defendant)). The posture of the defendant's case is instead more similar to recent denials of requests to release convicted defendants in light of the COVID-19 situation. *See, e.g.*, *United States v. Cohen*, No. 18 Cr. 602 (WHP), 2020 WL 1428778, at *1 (S.D.N.Y. Mar. 24, 2020) (denying request for home confinement based, in part, on conditions at MCC relating to COVID-19); *United States v. Acosta*, 19 Cr. 848 (NRB) (Dkt. No. 14) (S.D.N.Y. Mar. 25, 2020) (denying bail application for convicted defendant detained in MCC and finding that "[A]cceptance of the argument that this defendant should be released given the COVID-19 virus would logically result in the wholesale release of inmates. The Court does not accept the proposition that such a result is either better for the inmate or for society more broadly."); *United States v. Gileno*, No. 19 Cr. 161 (VAB), 2020 WL 1307108, at *3 (D. Conn. Mar. 19, 2020) (denying request for home confinement and noting that "the Court cannot assume that the Bureau of Prisons will be unable to manage the [COVID-19] outbreak or adequately treat [the defendant] should it emerge at his correctional facility while he is still incarcerated"). Moreover, even in cases where a defendant is pending trial, and thus 18 U.S.C. § 3142(i) could apply, courts have denied similar requests for relief. *See, e.g.*, *United States v. Hamilton*, No. 19 Cr. 54 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020) (denying request for pretrial release based on conditions at MDC relating to COVID-19 and noting that 18 U.S.C. § 3142(i) "has been used sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injuries").

### ii. The Conditions at MCC Permit the Defendant Access to Counsel

While it is certain that the COVID-19 situation has necessitated temporary changes at the MCC relating to attorney-client interactions, MCC is working steadfastly and quickly to present alternatives to in-person meetings. Defense counsel recently communicated with the defendant by phone, and the Government understands that future requests by counsel for phone calls will be accommodated. Defense counsel further has the ability to communicate with the defendant through e-mail. Moreover, the MCC is working to set up videoconferencing capabilities as early as next week, to which the defendant will have access. These measures are appropriate to protect the health of inmates and staff while balancing the needs of defendants to communicate with counsel. Given the medical community's near-universally accepted mandate that in-person meetings should be avoided for everyone, whether incarcerated or not, the defendant's access to legal calls and email is plainly a suitable alternative to face-to-face meetings for the duration of the most serious danger posed by COVID-19.

Moreover, much of the defendant's argument regarding the challenges of preparing for his sentencing are predicated on the defendant's unwillingness to adjourn the sentencing date. The Government understands that the defendant is anxious to proceed to sentencing—and the Government is prepared to proceed to sentencing as early as next week should the Court wish to do so. But the defendant cannot complain that he is unable to meet the time expectations of his sentencing while simultaneously objecting to an easing of those deadlines. A brief adjournment of the sentencing date would permit counsel additional time to hold calls and videoconferences with the defendant, or perhaps to meet in person whenever the COVID-19 protocols can safely be relaxed. Given that the defendant is facing a maximum sentence of 30 years in prison and a Guidelines Range of 70 to 87 months' imprisonment, an adjournment of a few weeks is not unreasonable, and is an infinitely more appropriate solution to addressing the defendant's concerns than is release from custody given the risk of flight that he poses.

### iii. The Bureau of Prisons Is Prepared to Handle the Risks Posed by COVID-19

The Bureau of Prisons ("BOP") has informed the Government that it is prepared to handle the risks posed by COVID-19, as with other infectious diseases and other medical conditions. Since at least October 2012, BOP has had a Pandemic Influenza Plan in place. (Exhibit C, BOP Health Management Resources Webpage). Moreover, beginning approximately two months ago, in January 2020, BOP began to plan specifically for its response to COVID-19 to ensure the health and safety of inmates and BOP personnel. (Exhibit D, Federal Bureau of Prisons COVID-19 Action Plan). As part of its Phase One response to COVID-19, BOP began to study "where the infection was occurring and best practices to mitigate transmission." *Id*. In addition, BOP established "an agency task force" to study and coordinate its response to COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization], the [Centers for Disease Control and Prevention], the Office of Personnel Management, the Department of Justice ("DOJ") and the Office of the Vice President." *Id.*

On March 13, 2020, the BOP, after coordination with DOJ and the White House, implemented its Phase Two response "in order to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." *Id*. BOP's national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." *Id.* For example, BOP (a) suspended social visits for 30 days (but increased inmates access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmates movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." *Id*. In addition, BOP has implemented screening protocols for both BOP staff and inmates, with staff being subject to "enhanced screening" and inmates being subject to screening managed by its infectious disease management programs. *Id*. As part of BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id*.

In addition to the BOP-wide measures described above, the MCC has instituted supplemental protocols, such as (i) conducting medical screening of all inmates and personnel who enter the facility, including with temperature checks; (ii) increasing the number of medical personnel on duty each day, and expanding the hours to around-the-clock coverage; (iii) distributing cleaning supplies and hygiene products to inmates and issuing instructions on personal hygiene; and (iv) segregating at-risk inmates from the general population, which is defined as including inmates over the age of 60 and those with underlying health conditions. (*See* Exhibit E (letter to Chief Judge McMahon regarding measures at MCC and the Metropolitan Detention Center in Brooklyn to respond to COVID-19)).

Finally, in compliment to the measures imposed by the BOP, the Department of Justice is also undertaking efforts to identify at-risk inmates and to consider whether release is appropriate. The defendant does not qualify as at-risk because he is only 52 years' old and is in good health with no underlying medical conditions. (PSR ¶ 84).

### III.     Conclusion

For the foregoing reasons, the defendant's request for post-conviction release should be denied.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

by:   /s/
Samuel Adelsberg
Amanda L. Houle
Assistant United States Attorneys
(212) 637-2194

Enclosures

cc:     Defense counsel (by ECF)