UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                      :

UNITED STATES OF AMERICA       :
                                        :

      - v. -                         :
                                        :

SAMARK LOPEZ BELLO,        :            19 Cr. 144 (AKH)
                                        :

        Defendant.           :

                                        :
-------------------------------------------------------x

## THE GOVERNMENT'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT SAMARK LOPEZ BELLO'S MOTION TO DISMISS THE INDICTMENT

DAMIAN WILLIAMS
United States Attorney
for the Southern District of New York

Sam Adelsberg
Assistant United States Attorney
- Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND .......................................................................................................... 2

    I.     Facts ................................................................................................................. 2

    II.    Procedural History ........................................................................................... 3

    I.     Lopez Bello's Motion to Dismiss the Kingpin Act Charges Should Be Denied ......... 5

        A.    Applicable Law ................................................................................... 6

        B.    Discussion .......................................................................................... 7

            1.    Background and Statutory Framework ........................................... 7

            2.    The Indictment Sufficiently Alleges a Conspiracy to Violate the Kingpin Act and Related Regulations ................................................................ 9

            3.    Lopez Bello's Challenges to the Kingpin Act Counts Are Without Merit ..... 11

            a.    The Argument that the Kingpin Act Cannot Apply to Lopez Bello Is Meritless ................................................................ 12

            b.    The Defendant Misconstrues and Misapplies the Second Circuit's Decision in Hoskins ................................................ 20

        C.    The Presumption Against Extraterritoriality Does Not Bar the Kingpin Act Counts ................................................................................................ 27

    II.    Lopez Bello's Motion to Dismiss the Conspiracy to Defraud the United States Charge (Count One) Should Be Denied ................................................ 33

CONCLUSION ........................................................................................................... 40

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in further opposition to defendant Samark Lopez Bello's motion to dismiss the indictment, and in response to the Court's order, dated December 14, 2022, directing the Government to respond to Lopez Bello's merits arguments. (Dkt. No. 261).

As set forth in the Government's initial brief (Dkt. No. 256), because Lopez Bello is a fugitive actively avoiding the Court's jurisdiction, the Court should apply the fugitive disentitlement doctrine and decline to reach the merits of Lopez Bello's motion. In any event, for the reasons detailed below, to the extent the Court is inclined to consider Lopez Bello's motion, the motion fails on the merits and should be denied. The defendant is appropriately charged under the Kingpin Act, as the indictment tracks the language of the statute and alleges all the necessary elements. To the extent there are disputes over the interpretation of the statute, the Court can resolve those issues in connection with any trial when determining the appropriate legal instructions to provide regarding the elements of the offense, and the jury will determine whether the Government's proof establishes a violation of the statute. Furthermore, the text, structure, and legislative history of the Kingpin Act demonstrate Congress's clear intent to counter foreign narco-traffickers and their associates, like Lopez Bello, who abuse the U.S. financial system by engaging in transactions with U.S. persons or within the United States.

Lopez Bello's arguments regarding the presumption against extraterritoriality also miss the mark for several reasons. For one, the charges in the indictment are not being applied extraterritorially; Lopez Bello intentionally sent millions of dollars of payments to the United States for flights organized in, departing from, and returning to the United States—all in violation of the Kingpin Act. Even if Lopez Bello's conduct was deemed "extraterritorial," the Kingpin Act

falls clearly within a class of criminal statutes that have long been held exempt from any presumption against extraterritoriality.  Indeed, the act, titled the Foreign Narcotics Kingpin Designation Act—a law that on its face was enacted to combat foreign threats—is a statute that clearly contemplates extraterritorial application to protect the national security and economy of the United States.

Similarly, Lopez Bello's challenges to Count One of the indictment—which charges a straightforward conspiracy to defraud the United States and impede the functions of a government agency by deceptively scheming with others to evade the Treasury Department's sanctions—fall far short.  Conspiracies to defraud the United States have long been cognizable in the Second Circuit under 18 U.S.C. § 371 and the conduct alleged here lies well within the heartland of these precedents.  Nor is Count One an improper extraterritorial application of the statute given the domestic nature of the conduct here, Section 371's status as a law that is, by definition, a crime that implicates the right of the U.S. Government to protect its functions, and Lopez Bello's inability to cite a single case where a court invalidated a *Klein* conspiracy on grounds of extraterritoriality. This Court should deny Lopez Bello's motion.

## BACKGROUND

### I.    Facts

The factual allegations are laid out more fully in the Government's prior opposition memorandum, dated October 21, 2022.  (Dkt. No. 256 at 5-28).  In brief, after the U.S. Treasury Department designated Lopez Bello as a Specially Designated Narcotics Trafficker ("SDNT") pursuant to the Kingpin Act for his narcotics trafficking and money laundering activities, Lopez Bello immediately set out to evade the Treasury Department's controls by organizing, along with his co-conspirators, private charter flights from a U.S.-based flight services provider. The timing of this sanctions evasion scheme was crucial; the flights were procured at a time when the United

States and its allies were engaged in the critical undertaking of depriving Venezuela and its leadership of resources for its authoritarian and deadly activities—including its systematic and often fatal repression of activists, its subversion of Venezuelan democratic institutions, and its corrupt plundering of Venezuela's natural resources.

Despite Lopez Bello's efforts to paint his conduct as entirely foreign, it was not.  The focus of Lopez Bello's elaborate criminal scheme was domestic: Lopez Bello wanted to continue to benefit from the use of U.S.-based planes, pilots, and travel services notwithstanding the U.S. sanctions that directly prohibit such transactions.  Specifically, Lopez Bello enlisted U.S. citizens Victor Mones Coro ("Mones") and Alejandro Leon Maal ("Leon"), and Mones's Florida-based company, American Charter Services LLC ("ACS"), as well as ACS's U.S.-based planes, pilots, employees, contract workers, bank accounts, and logistical infrastructure to continue working on behalf of Lopez Bello in the United States and to organize flights to transport Lopez Bello, his family members, and his associates. Indeed, the flights were arranged in the United States and the planes and pilots were based in the United States, travelling abroad during the course of the flights. Many of these flights initially departed from airports in Florida before landing in Venezuela or elsewhere to transport Lopez Bello and his passengers to foreign countries, including those of strategic importance to the Maduro regime during this period, such as Russia and Turkey.  Lopez Bello then paid for the planes to return to the United States.  Notably, Lopez Bello surreptitiously paid these U.S. citizens and entities for these flights through cash smuggled to the United States, wire transfers sent through front companies to a bank account in the United States, and an illegal in-kind payment in the form of an aircraft based in the United States.

## II.    Procedural History

On March 1, 2019, a grand jury sitting in this District returned a five-count indictment charging Lopez Bello and several co-defendants with violations of the Kingpin Act and the

implementing Foreign Narcotics Kingpin Sanctions Regulations, 31 C.F.R. Part 598 (the "Kingpin

Act Regulations").  On March 13, 2020, an eight-count superseding indictment (the "Indictment"

or "Ind.") was filed charging Lopez Bello with (1) conspiracy to obstruct the lawful governmental

functions of the Treasury Department's Office of Foreign Assets Control ("OFAC"), in violation

of 18 U.S.C. § 371 ("Count One"); (2) conspiracy to (i) engage in prohibited transactions in

blocked property, (ii) evade the provisions of the Kingpin Act and pertinent OFAC SDNT

regulations, and (iii) use U.S. entities to engage in prohibited transactions in blocked property and

evade the provisions of the Kingpin Act and pertinent OFAC SDNT regulations, in violation of 21

U.S.C. §§ 1906(a), 1904(c)(1), and 1904(c)(2) ("Count Four"); (3) two counts of participation by

an agent of an "entity," *i.e.*, ACS and SVMI Solutions LLC ("SVMI"), in prohibited transactions

in blocked property of SDNTs, and aiding and abetting the same, in violation of 21 U.S.C.

§§ 1906(a)(2), 1904(c)(1), and 18 U.S.C. § 2 ("Count Five" and "Count Seven"); and (4) two

counts of participation by an agent of an "entity," *i.e.*, ACS and SVMI, in evading and attempting

to evade the provisions of the Kingpin Act and pertinent OFAC SDNT regulations, and aiding and

abetting the same, in violation of 21 U.S.C. §§ 1906(a)(2), 1904(c)(2), and 18 U.S.C. § 2 ("Count

Six" and "Count Eight").

On September 16, 2022, Lopez Bello filed the instant motion to dismiss the

Indictment.  (Dkt. No. 255 ("Def. Mem.")).  Lopez Bello raises several arguments in his motion,

including (i) that he does not fall within the class of persons chargeable under the Kingpin Act, (ii)

that the presumption against extraterritoriality precludes his charges under both the Kingpin Act

and 18 U.S.C. § 371, and (iii) that the Government has not properly alleged a *Klein* conspiracy

under 18 U.S.C. § 371.  (Def. Mem. 4-20).  The Government opposed that motion on October 21,

2022, on the ground that Lopez Bello, as a fugitive who had made his life in the United States

immediately before his offense conduct began, was disentitled from challenging the Indictment, and that the Court should therefore decline to consider the motion on the merits.  (Dkt. No. 256). On December 14, 2022, the Court ordered the Government to respond to Lopez Bello's motion on the merits.  (Dkt. No. 261).

## I.   Lopez Bello's Motion to Dismiss the Kingpin Act Charges Should Be Denied

The Court should reject the defendant's argument that the Kingpin Act charges should be dismissed because, in the defendant's view, he does not fall within the category of persons who can violate the Kingpin Act.  For starters, the Indictment tracks the language of the Kingpin Act, which is all that is required under the law.  And any disputes over the interpretation of the statute are properly resolved in connection with any trial when determining the appropriate legal instructions to provide the jury regarding the elements of the offense.  In any event, the text, structure, and legislative history of the Kingpin Act demonstrate Congress's clear intent to counter foreign narco-traffickers, like Lopez Bello, who abuse the U.S. financial system by engaging in transactions with U.S. persons and within the United States.

The defendant's argument that the presumption against extraterritoriality bars prosecution under the Kingpin Act also misses the mark for several reasons.  First, the charges in the Indictment are not being applied extraterritorially.  Second, even if the fact that Lopez Bello's decision to leverage U.S.-based travel services and aircraft was hatched overseas were enough (which it is not) to make the application of the law to his conduct "extraterritorial," the Kingpin Act falls clearly within a class of criminal statutes that have long been held exempt from any presumption against extraterritoriality.  And, in fact, the Kingpin Act—a law explicitly enacted to combat foreign threats—is a statute that clearly contemplates extraterritorial application to protect the national security and economy of the United States.  It is well settled that there is no presumption against the extraterritorial enforcement of criminal statutes that protect the U.S. Government, and

foreign nationals operating abroad have been charged in this District and others with criminal violations of national security controls.  Accordingly, this argument fails as well.

### A.  Applicable Law

"A criminal defendant is entitled to an indictment that states the essential elements of the charge against him." *United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000) (citing *Jones v. United States*, 526 U.S. 227, 232 (1999); *Hamling v. United States*, 418 U.S. 87, 117 (1974); Fed. R. Crim. P. 7(c)).  "A defendant faces a 'high standard' in seeking to dismiss an indictment." *United States v. Thompson*, No. 13 Cr. 378 (AJN), 2013 WL 6246489, at *6 (S.D.N.Y. Dec. 3, 2013) (quoting *United States v. Post*, No. 08 Cr. 243 (KMK), 2013 WL 2934229, at *5 (S.D.N.Y. June 3, 2013)). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling*, 418 U.S. at 117.  "An indictment must be read to include facts which are necessarily implied by the specific allegations made." *United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002) (internal quotation marks omitted).

"[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." *United States v. Alfonso*, 143 F.3d 772, 777 (2d Cir. 1998).  Accordingly, "[i]n reviewing a motion to dismiss an indictment, the Court must take the allegations of the indictment as true." *United States v. Skelos*, No. 15 Cr. 317 (KMW), 2015 WL 6159326, at *2 (S.D.N.Y. Oct. 20, 2015) (citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952).  Moreover, "[t]he dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (internal quotation marks and citation omitted).  Finally, although the Court has "supervisory authority over the administration of criminal justice," *McNabb v.*

*United States*, 318 U.S. 332, 341 (1942), the Second Circuit has clearly held that "[a] district court does not have the power to dismiss an indictment that is legally sufficient simply because it deems the dismissal to be in the interest of justice." *United States v. Artuso*, 618 F.2d 192, 196 (2d Cir. 1980) (citation omitted).

### B.  Discussion

The Court should reject the defendant's argument that counts in the Indictment relating to violations of the Kingpin Act—namely, Counts Four through Eight (the "Kingpin Act Counts")—should be dismissed because, the defendant contends, he "does not fall within the category of persons who can violate the Kingpin Act and Kingpin Act Regulations."  (Def. Mem. 4).  The Government has more than satisfied its burden at this stage of the litigation since the Indictment tracks the language of the Kingpin Act.  The defendant's statutory interpretation argument is premature and in any event wrong and inconsistent with the plain language and legislative history of the statute.  And even if the defendant's reading of the Kingpin Act was correct, the Government will establish at trial that Lopez Bello committed acts within the United States to further the crimes charged in the Kingpin Act Counts.

### 1.  *Background and Statutory Framework*

On December 3, 1999, the President signed the Kingpin Act into law.  *See* 21 U.S.C. §§ 1901-1908, 8 U.S.C. § 1182; Pub. L. 106-120, 113 Stat. 1606.  As the law makes clear, its "purpose . . . is to provide authority for the identification of, and application of sanctions on a worldwide basis to, significant foreign narcotics traffickers, their organizations, and the foreign persons who provide support to those significant foreign narcotics traffickers and their organizations, whose activities threaten the national security, foreign policy, and economy of the United States."  21

U.S.C. § 1902.  In signing the final legislation into law, the President issued the following signing

statement:

> This Act . . . establishes a global program targeting the activities of significant
> foreign narcotics traffickers and their organizations. The new Act provides a
> statutory framework for the President to institute sanctions against foreign drug
> kingpins when such sanctions are appropriate, with the objective of denying their
> businesses and agents access to the U.S. financial system and to the benefits of trade
> and transactions involving U.S. businesses and individuals. Working with other
> nations, I intend to use the tools in this provision to combat the national security
> threat posed to the United States by international drug trafficking.[1]

The Kingpin Act delegated rulemaking authority to the U.S. Department of the Treasury.

31 C.F.R. § 598.803.  In fact, "Congress modeled the Kingpin Act on the effective sanctions

program that [Treasury's OFAC] administers . . . under authority of the International Emergency

Economic Powers Act ("IEEPA").[2]  On July 5, 2000, OFAC issued the Foreign Narcotics Kingpin

Sanctions Regulations, 31 C.F.R. Part 598, which implement the Kingpin Act and block all

property and interests in property within the United States, or within the possession or control of

any U.S. person, which are owned or controlled by persons identified as "specially designated

narcotics traffickers" or SDNTs.  OFAC publishes the names of SDNTs on its Specially

Designated Nationals and Blocked Persons List ("SDN List").  31 C.F.R. § 598.314.

While SDNTs are necessarily not U.S. persons, the Kingpin Act does not limit criminal

liability for violations of the law to U.S. persons.  Rather, under the statute, criminal liability

attaches to "*whoever* willfully violates the provisions of [the Kingpin Act], or any license[,] rule,

---

[1] Clinton, William Jefferson (3 December 1999): "Statement on Signing the Intelligence
Authorization Act for Fiscal Year 2000," https://www.govinfo.gov/content/pkg/PPP-1999-
book2/pdf/PPP-1999-book2-doc-pg2206.pdf.

[2] *See* White House Fact Sheet on Kingpin Act (Apr. 15, 2009),
https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-overview-foreign-narcotics-
kingpin-designation-act.

or regulation issued pursuant [thereto], or willfully neglects or refuses to comply with any order of the President issued [thereunder]."  21 U.S.C. § 1906(a) (emphasis added).  In setting forth the potential set of transactions that are prohibited by the Kingpin Act, the law sets forth explicit limitations as follows: (1) "[a]ny transaction or dealing by a United States person, or within the United States, in property or interests in property of" persons sanctioned under the Act, *id.* § 1904(c)(1); and (2) "[a]ny transaction or dealing by a United States person, or within the United States, that evades or avoids, or has the effect of evading or avoiding, and any endeavor, attempt, or conspiracy to violate, any of the prohibitions contained in the [Kingpin Act]," *id.* § 1904(c)(2). OFAC interprets the Kingpin Act to "apply to services performed by U.S. persons, wherever located (1) [o]n behalf of or for the benefit of [an SDNT]; or (2) [w]ith respect to property interests of a specially designated narcotics trafficker."  31 C.F.R. § 598.406(a).  In the regulation promulgating this interpretation, OFAC specified as an "[e]xample" that "U.S. persons may not, except as authorized by or pursuant to this part, provide . . . transportation . . . or other services to [an SDNT]."  *Id.* § 598.406(b).  Finally, the Kingpin Act explicitly prohibits conspiracies and attempts to violate these provisions.  *Id.* § 1904(c)(2).

2.  *The Indictment Sufficiently Alleges a Conspiracy to Violate the Kingpin Act and Related Regulations*

Count Four of the Indictment charges Lopez Bello and several of his co-conspirators  with conspiring to (i) engage in prohibited transactions in blocked property; (ii) evade the provisions of the Kingpin Act and pertinent OFAC SDNT regulations; and (iii) use ACS and SVMI to engage in prohibited transactions in blocked property and evade the provisions of the Kingpin Act and pertinent OFAC SDNT regulations, in violation of 21 U.S.C. §§ 1906(a), 1904(c)(1), 1904(c)(2). As noted above, Counts Five through Eight charge Lopez Bello with various substantive Kingpin Act offenses, including two counts of participation by an agent of an "entity" (ACS and SVMI) in

prohibited transactions in blocked property, and aiding and abetting the same, in violation of 21 U.S.C. §§ 1906(a)(2), 1904(c)(1), and 2 (Count Five and Count Seven), and two counts of participation by an agent of an "entity" (ACS and SVMI) in evading and attempting to evade the provisions of the Kingpin Act and pertinent OFAC SDNT regulations, and aiding and abetting the same, in violation of 21 U.S.C. §§ 1906(a)(2), 1904(c)(2), and 2 (Count Six and Count Eight). Lopez Bello and his co-conspirators criminally violated the Kingpin Act and its related regulations because they willfully conspired to violate and to cause a violation of these Kingpin Act provisions. The Indictment properly tracks the statute and alleges the essential elements of these offenses, and the Kingpin Act applies by its plain language to the alleged offenses. (Ind. ¶¶ 34-46).

Were Lopez Bello to surrender himself, the evidence at a trial would show that he and his co-conspirators conspired to violate, and violated, the Kingpin Act in several different ways. Between February 2017 and March 2019, Lopez Bello enlisted U.S. persons and entities to engage in prohibited transactions in "blocked property"—specifically, funds in which Lopez Bello, as an SDNT, had an interest. (Ind. ¶ 35). The blocked property was used as payment for prohibited charter "services" provided to Lopez Bello by Mones and Leon through ACS and SVMI—U.S. persons operating U.S. entities. (Ind. ¶ 4). Lopez Bello's illegal payments flowed in various forms: wire transfers to the United States, smuggled cash to the United States, and an in-kind transfer of Lopez Bello's aircraft located in the United States. (*See* Ind. ¶ 4). In exchange for these illegal payments, Lopez Bello received a range of prohibited services by U.S. persons in the United States and elsewhere, including dozens of private charter flights aboard U.S.-registered aircraft, maintenance of aircraft, and logistical support for travel—all in direct violation of OFAC's sanctions. (*See* Ind. ¶¶ 3, 24). Lopez Bello and his co-conspirators also evaded and attempted to evade the sanctions in several ways, including by using shell companies to pay for the flight

services, ensuring that Lopez Bello's name was omitted from passenger manifests, structuring the circuitous transfer of a plane as an in-kind payment, smuggling cash into the United States from Venezuela on several occasions, ensuring Lopez Bello did not traverse the United States during his illegal flights, and using encrypted applications and code names. (*See, e.g.*, Ind. ¶ 4). While the conspiracy count, Count Four, does not require that Lopez Bello and his co-conspirators were successful in their endeavors to transact in blocked property and evade the sanctions, the substantive counts in the Indictment reflect the fact that the defendants succeeded in their scheme to access U.S.-based services in contravention of OFAC's sanctions. Lopez Bello obtained private flights from U.S. persons and U.S. entities, on U.S.-registered aircraft, and participated in blocked transactions by paying Mones and Leon for those services in the United States. (*See* Ind. ¶¶ 3, 24). In connection with these transactions, Mones and Leon acted as agents of ACS and SVMI, and Lopez Bello is subject to aiding and abetting liability for his role in causing Mones and Leon to act in violation of the sanctions on behalf of those entities by requesting and paying for the flight services. (Ind. ¶¶ 40-46). Thus, the Indictment properly alleges violations of the Kingpin Act and should not be dismissed.

### 3.   *Lopez Bello's Challenges to the Kingpin Act Counts Are Without Merit*

Although the Indictment properly alleges the essential elements of the Kingpin Act violations charged in Counts Four through Eight, and the plain language of the statute and regulations apply to Lopez Bello and his conduct, Lopez Bello argues that: (i) he cannot violate the Kingpin Act given the law's the text, structure, and legislative history (Def. Mem. 4-12); (ii) the Second Circuit's decision in *United States v. Hoskins*, 902 F.3d 69, 84 (2d Cir. 2018), forecloses "a prosecution of Mr. Lopez Bello on a theory of conspiracy" (Def. Mem. 4-12); and (iii) the Kingpin Act does not apply extraterritorially. As discussed more fully below, each of these

contentions is without merit because they are flatly refuted by the plain language of the Kingpin Act, and they rely on mischaracterizations of the alleged offense conduct and selective citations to case law and legislative history .

> a.  *The Argument that the Kingpin Act Cannot Apply to Lopez Bello Is Meritless*

As an initial matter, the plain text and structure of the Kingpin Act supports application to Lopez Bello and his scheme to leverage U.S.-based travel services following his designation.  The law, critically, does not limit liability to U.S. persons.   Under the statute's section entitled "Enforcement" and subtitled "criminal penalties," criminal liability attaches to "whoever willfully violates the provisions of [the Kingpin Act], or any license[,] rule, or regulation issued pursuant [thereto], or willfully neglects or refuses to comply with any order of the President issued [thereunder]."  21 U.S.C. § 1906(a); *see United States v. Van Buren*, 599 F.3d 170, 173 (2d Cir. 2010) (analyzing "SORNA's criminal enforcement provision" to determine the statute's reach). And in setting forth the potential set of transactions that would violate the Kingpin Act, the law explicitly prohibits: (1) "[a]ny transaction or dealing by a United States person, or within the United States, in property or interests in property of" persons sanctioned under the Act, *id.* § 1904(c)(1); and (2) "[a]ny transaction or dealing by a United States person, or within the United States, that evades or avoids, or has the effect of evading or avoiding, and any endeavor, attempt, or conspiracy to violate, any of the prohibitions contained in the [Kingpin Act]," *id.* § 1904(c)(2). Thus, the Kingpin Act clearly applies to "whoever"—meaning both U.S. persons and foreigners— engages in the specific set of prohibited transactions outlined in the statute.  *See United States v. Epskamp*, 832 F.3d 154, 163 (2d Cir. 2016) (analyzing 21 U.S.C. § 959 and noting that the term "any person (as compared with any United States citizen)" applies the statute to both citizens and foreign nationals, and the term "any aircraft" applies the statute to aircraft registered to or owned

by either citizens or foreign nationals); *see also Suzlon Energy Ltd. v. Microsoft Corp.*, 671 F.3d 726, 729 (9th Cir. 2011) (holding that "any person" in the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.*, "means any person, including foreign citizens"); *New York v. Trump*, 485 F. Supp. 3d 422, 472 (S.D.N.Y. 2020) ("Congress thus distinguishes between a 'citizen' and 'any person' when it wishes to do so.").   Congress further elucidated the scope of the statute—and its applicability to non-U.S. citizens—in the provision entitled "Purpose," which states that "[t]he purpose of this chapter is to provide authority for the identification of, and application of sanctions on a worldwide basis to, significant foreign narcotics traffickers, their organizations, *and the foreign persons who provide support to those significant foreign narcotics traffickers and their organizations*, whose activities threaten the national security, foreign policy, and economy of the United States.". 21 U.S.C. § 1902.  Clearly, Congress intended for the Kingpin Act to not only reach foreign drug traffickers, but also those "foreign persons" who support them by leveraging U.S. persons or facilitating transactions in the United States.

The defense's own citations to cases where Congress used specific language to limit enforcement to only U.S. persons only support the conclusion that in enacting Section 1906's inclusive "whoever" language, Congress made clear that the Kingpin Act applies to both U.S. persons and non-U.S. persons engaging in the enumerated transactions set forth in the statute.  (*See* Def. Mem. 5).  For example, in *United States v. Chalmers*, 474 F. Supp. 2d 555 (S.D.N.Y. 2007), Judge Chin concluded that a non-U.S. person cannot aid and abet a violation of 18 U.S.C. § 2332d, which, by its own terms, applies only to "*whoever, being a United States person*" violates the statute.  *Id.* at 565-66 (emphasis added).  In contrast to the Kingpin Act, which prohibits U.S. persons and non-U.S. persons alike from performing transactions outlined by the statute, Section 2332d specifically limits enforcement to U.S. persons.  *Id.*; *see also United States v. Yakou*, 428

13

F.3d 241, 252 (D.C. Cir. 2005) ("[T]he congressional choice to limit liability to 'U.S. persons' [for purposes of the brokering amendment to the Arms Export Control Act] is highly significant and inconsistent with catching the non-U.S. person who happens to engage in brokering activities with a 'U.S. person.'").  Congress's deliberate choice to not limit enforcement of the law to U.S. persons is all the more apparent in light of the fact that the following provision in the Kingpin Act—21 U.S.C. § 1907—defines both "foreign person" and "United States person."  *See Unicolors, Inc. v. H&M Hennes & Mauritz, L. P.*, 142 S. Ct. 941, 942 (2022) ("Nearby statutory provisions help confirm that here 'knowledge' refers to knowledge of the law as well as the facts."); *Henderson v. INS*, 157 F.3d 106, 129-30 (2d Cir. 1998) ("Congress' use of explicitly retroactive language in that part of the bill, and its failure to employ any analogous language in the nearby and closely related [provision] by itself strongly indicates that Congress did not intend [the latter provision] to apply retroactively.").  Congress certainly had the tools to limit enforcement to only U.S. persons in the statute's enforcement provision but deliberately chose not to do so.

Thus, as a foreigner—albeit one with significant connections to the United States—Lopez Bello is plainly covered by the language in the statute's enforcement provision.  *See* 21 U.S.C. § 1906(a).  That is not to say that any foreigner can be charged with a violation of the Kingpin Act for merely transacting with a designated party.  Rather, the text of the law only reaches a foreigner who engages in one of the prohibited transactions prescribed by the act—namely a "transaction or dealing by a United States person, or within the United States," (1) "in property or interests in property of" persons sanctioned under the Act, 21 U.S.C. § 1904(c)(1); or (2) "that evades or avoids, or has the effect of evading or avoiding, and any endeavor, attempt, or conspiracy to

violate, any of the prohibitions contained in the [Kingpin Act]," *id.* § 1904(c)(2).[3]  Nowhere does

the law limit liability to only U.S. persons; to the contrary, in addition to the "whoever" language

in the enforcement provision, the law also extends to those who "endeavor, attempt, or conspir[e]"

to violate the Kingpin Act, without any limitation to U.S. persons.  *Id.*

As set forth in the Indictment, Lopez Bello engaged in the types of transactions prescribed

by the Kingpin Act, and both conspired and aided and abetted others in doing the same.  Following

his designation as an SDNT in February 2017, Lopez Bello paid millions of dollars to U.S. persons

and U.S. entities for travel services through wire payments to an account at a U.S. bank, cash

smuggled into the United States, and the transfer of a U.S.-based and U.S.-registered aircraft.  The

defendant clearly had a property interest in the payments he made in the United States for travel

services provided directly to him.  These transactions involved Lopez Bello sending funds to U.S.

persons (*i.e.*, Mones, Leon, ACS, and SVMI),[4] *and* the funds from the transactions entered the

United States—satisfying either prong of Section 1904(c)(1).  *See* 21 § U.S.C. 1904(c)(1)

(prohibiting "[a]ny transaction or dealing by a United States person, or within the United States,

in property or interests in property of" an SDNT).  Also satisfying the statute  is the fact that he

---

[3] For this reason, the defendant's surplusage argument (Def. Mem. 13) fails.  Sections 1904(c)(1) and (c)(2) cover separate but related conduct: the former covers transactions with SDNTs while the latter covers transactions evading or avoiding the Kingpin Act's prohibitions.  For a foreigner to be held liable under either provision, the foreigner must still engage in a transaction either with U.S. persons or within the United States.  Nothing in either provision is surplusage.  In any event, the Supreme Court has noted that "[r]edundancy is not a silver bullet . . . . Sometimes the better overall reading of the statute contains some redundancy."  *Rimini Street, Inc., v. Oracle USA, Inc.* 129 S. Ct. 873, 881 (2019).  The defendant's argument based on the surplusage canon is contrary to the clear text of the law and Congress's legislative intent, and easily rejected.

[4] The term "U.S. person" includes "any United States citizen or national," "permanent resident alien," "entity organized under the laws of the United States," and "any person within the United States."  31 C.F.R. § 598.318.

transacted for illegal flights aboard planes located in, departing from, and returning to the United States.  For the same reasons, Lopez Bello's evasive transactions and dealings—including the use of secret payments, aliases, and doctored flight manifests, all deployed in concert with U.S. persons and within the United States—to hide his illicit transfer of these funds and his presence on these U.S.-originated flights also satisfies Section 1904(c)(2).

Notably, even if the Court concludes (despite the inclusive language of the law's enforcement provision) that the Kingpin Act cannot apply to foreigners operating from abroad (which it can and does here, as explained above), Lopez Bello concedes that the Kingpin Act's prohibitions apply to "those involved in transactions or dealings within the United States."  (Def. Mem. 4).  And the Indictment makes clear that Lopez Bello participated in transactions and dealings "within the United States." (*See* Ind. ¶¶ 4, 36, 37, 38, 40, 44, 46).  Lopez Bello's argument appears to boil down to the contention that by not "being on U.S. soil" while he committed this conduct, he is immune from prosecution for transactions involving funds he sent into the United States and flights he procured from the United States.[5]  Such a reading of the Kingpin Act is unsupported and runs directly counter to the express purpose of the Kingpin Act to combat foreign drug kingpins and their enablers abusing the U.S. financial system from afar.  *See also United States v. Zarrab*, No. 15 Cr. 867 (RMB), 2016 WL 6820737, at *10 (S.D.N.Y. Oct. 17, 2016)

---

[5] Relatedly, contrary to the defense's argument on this score (Def. Mem. 3), the Government's venue allegation that the crimes were "begun and committed outside of the jurisdiction of any particular State or district of the United States," pursuant to 18 U.S.C. § 3238, does not support the defendant's argument that Lopez Bello's offenses were not committed "within the United States" for the purposes of the Kingpin Act.  Indeed, the Indictment contains no fewer than seven references to Lopez Bello's crimes committed within the United States.  (*See* Ind. ¶¶ 4, 36, 37, 38, 40, 44, 46).  On the other hand, Section 3238 is merely one of the "generic venue-laying statutes," and also does not preclude establishing natural venue by proving conduct in a particular district pursuant to, for example, 18 U.S.C. § 3237, the continuing offense venue statute.  *United States v. Miller*, 808 F.3d 607, 614 (2d Cir. 2015).

(concluding that defendant who never set foot in the United States may still be prosecuted under a statute criminalizing sanctions violations emanating "from the United States" in light of wire transfers sent through the United States); *see also Bascunan v. Elsaca*, 927 F.3d 108, 123 (2d Cir. 2019) ("We make clear today [that] while a defendant's location is relevant to whether the regulated conduct was domestic, the mail and wire fraud statutes do not give way simply because the alleged fraudster was located outside the United States."); *cf. United States v. Kim*, 246 F.3d 186, 189 (2d Cir. 2001) ("There would seem to be no logical reason for holding that Congress intended to punish those who cause the violation of a law regulating and protecting foreign commerce only when they act within the borders of the United States or that Congress is powerless to protect foreign commerce and those who engage in foreign commerce from intentionally injurious acts, simply because those acts occur outside our borders.").  Accordingly, the defense's claim that the defendant cannot be held to account for transactions that plainly occurred "within the United States" even if he was physically outside the United States cannot be squared with the plain language and purpose of the Kingpin Act.  *See Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016) ("Absent persuasive indications to the contrary, we presume Congress says what it means and means what it says.").

Indeed, contrary to the defendant's contentions (and while the Court need not reach any legislative history given that the defendant's argument plainly fails for the reasons discussed above), the Kingpin Act's legislative history only further confirms that Congress intended for the law to cover Lopez Bello's offense conduct.  In passing the Kingpin Act, Congress's goal for the law was abundantly clear: to achieve the greatest possible disruption of the operations of narcotics traffickers and their financial enablers, such as El Aissami and Lopez Bello.  Senator Coverdell, whom the defense cites in support of its motion, repeatedly made that clear.  *See* 145 Cong. Rec.

17

S14958 (daily ed. Nov. 19, 1999) ("One of our principal intentions with this legislation . . . [is to] focus . . . on the bad actors who are producing and trafficking the illegal drugs"); *id*. ("[The Kingpin Act] is a global initiative which targets foreign drug kingpins and their associates regardless of nationality and location"); *id.* ("It is important to remember that this bill targets foreign drug traffickers and their front companies, not U.S. entities.").  Similarly, the Joint Conference Report agreed upon by the House and Senate was also unambiguous in its description of the Act's intent: targeting foreign narco-traffickers.  *See* H.R. Rep. No. 106-457, at 42 ("The intention of this legislation is to strengthen the ability of United States law enforcement effectively to target international narcotics traffickers attaching [sic] the fabric of our society."); *see also id.* at 43 ("The bottom line objective of these provisions is to bankrupt and disrupt the major narcotics trafficking organizations. The targets of this legislation are not only the drug kingpins, but those involved in their illicit activities, such as: money laundering . . .and managing the assets of these criminal enterprises.").  And while the conference report highlights the potential impact on "U.S. individuals and companies" (*see* Def. Mem. 11-12)—which is unsurprising given that the law, by its own terms, applies to "whoever" engages in "any transaction or dealing by a United States person, or within the United States," 21 U.S.C. §§ 1904, 1906—nowhere in the extensive legislative history is there any suggestion that criminal enforcement of the law is limited to *only* U.S. individuals and companies or that Congress expressed a policy preference in doing so.

In support of his motion, the defendant removes two statements from their context to claim that they reflect congressional intent to apply the provisions of the Kingpin Act only to Americans. (Def. Mem. 12).  But again, the legislative history—over and over again—makes clear that Congress's chief focus during its consideration of the Kingpin Act was on "intensifying the pressure on foreign persons and foreign businesses involved in large-scale narcotics trafficking

18

and money laundering activities."  145 Cong. Rec. 11757 (daily ed. Nov. 09, 1999) (statement of

Rep. McCollum).  The defense first cites Representative Nadler in support of its claim that the

Kingpin Act's enforcement provisions were meant to target *only* Americans.  (Def. Mem. 12).  But

the citation completely ignores the context of these remarks.  Representative Nadler was not

commenting on limitations of the Act in applying to foreigners but instead articulating due process

concerns about the potential exposure of Americans who do business with a party designated under

the Kingpin Act:

> Title VIII of this bill, the Foreign Narcotics Kingpin Designation Act, empowers
> the President to designate people as 'significant foreign narcotics traffickers.' Once
> designated, all property in the United States of such a person is seized. Any
> American who does any business with him can be jailed for 10 years and fined $10
> million.  All this without any criteria for such designation in the bill. All this without
> any evidence being necessary. No notice, no hearing, no opportunity to be heard,
> no protection for the innocent, and no judicial review.

145 Cong. Rec. 11760 (daily ed. Nov. 09, 1999) (statement of Rep. Nadler).  Given this context,

the defense's interpretation of this statement—that it somehow evinces congressional intent to

limit enforcement of the Kingpin Act to Americans—is simply wrong.  Rather, Representative

Nadler's remarks expressed the view that the Act posed a due process challenge for all Americans

who may run afoul of its provisions.  In no way does Rep. Nadler suggest that—contrary to the

plain language of Section 1906—the law *only* applies to Americans.

The defense also mischaracterizes the remarks of Senator Coverdell.  (Def. Mem. 12

(quoting 145 Cong. Rec. S14951-02, at S14958 (daily ed. Nov. 19, 1999) (statement of Sen.

Coverdell) ("American firms or individuals who violate this prohibition would be subject to

significant financial penalties and, potentially, prison terms.")).  Once again, the fact that the Act's

prohibitions apply to Americans does not preclude their application to non-Americans, and Senator

Coverdell's remarks do not suggest that Congress intended to shield non-Americans from criminal

prosecution under the Act, contrary to the clear language of the enforcement provision of the

19

statute.  In fact, the sentence immediately preceding the quoted sentence makes clear Senator Coverdell's recognition of the broad application of the law to foreigners: "Any foreign entity which appears on the list would be prohibited from conducting any economic activity with the United States." *Id.*  In perpetrating the scheme charged here, Lopez Bello, using "foreign entit[ies] . . . conduct[ed] . . . economic activity with the United States" and thus clearly falls within the ambit of the law.  *Id.*

Simply put, the defendant advances a reading of the law that is squarely at odds with the text and structure of the statute and with the clear congressional intent to target foreign drug traffickers and their foreign facilitators.  Under the defense's theory, Congress meant to limit the law to domestic actors, even though the law contains no such limitation and is clearly aimed at countering foreign narcotics traffickers seeking to leverage U.S. persons or the United States for their benefit.  Indeed, the defense's interpretation would run directly contrary to the clear legislative intent of the law by permitting sanctioned narcotics traffickers—or any of their enablers—to move millions of dollars through the U.S. and in concert with U.S. citizens with no accountability, given their location abroad.  The defense's position is easily rejected.

        *b.  The Defendant Misconstrues and Misapplies the Second Circuit's Decision in* Hoskins

The defense argues that the Second Circuit's decision in *United States v. Hoskins*, 902 F.3d 69 (2d Cir. 2018), bars Lopez Bello's liability under the Kingpin Act.  (Def. Mem. 4-12).  The defense overstates the breadth of the *Hoskins* court's reasoning, disregards crucial elements of the court's analysis by selectively citing the decision, and misapplies the holding to the instant case.  The *Hoskins* decision only supports application of the Kingpin Act to Lopez Bello.

In *Hoskins*, the Second Circuit addressed whether an individual "not in the category of persons directly covered" by the Foreign Corrupt Practices Act ("FCPA") can be charged with

conspiracy or attempt liability.  902 F.3d at 71.  The court first recognized a "firm baseline rule" that "where the crime is so defined that only certain categories of persons, such as employees of a particular sort of entity, may commit the crime through their own acts, persons not within those categories can be guilty of conspiring to commit the crime or of the substantive crime itself as an accomplice."  902 F.3d at 77; *see also Ocasio v. United States*, 578 U.S. 282, 292 (2016) (noting that Supreme Court precedent "make[s] perfectly clear that a person may be convicted of conspiring to commit a substantive offense that he or she cannot personally commit").  The court, however, noted the existence of a "narrowly circumscribed exception" to this baseline rule when the legislative scheme demonstrates that "the lawmaker must have intended that accomplice liability not extend to certain persons whose conduct might otherwise fall within the general common-law or statutory definition of complicity."  *Id.* at 77-78.  In sketching out the contours of this narrow exception, the court made clear that it is not available merely because a statute "focuses on certain categories of persons at the exclusion of others."  *Id.* at 80.  The court then analyzed the structure, text, and legislative history of the FCPA, noting that they collectively evinced a clear signal of an "affirmative legislative policy" to exclude foreigners operating abroad from criminal culpability under the FCPA.  902 F.3d at 83-84.  In light of this "affirmative legislative policy," the court ultimately concluded that conspiracy and accessorial liability cannot be applied to reach an individual explicitly excluded from the FCPA's reach—someone who is "incapable of committing [an FCPA crime] as a principal," *id.* at 76.

The defendant's reliance on *Hoskins* is unavailing as none of the factors present in the FCPA context militate in favor of application to the Kingpin Act.  As an initial matter, the FCPA and the Kingpin Act contain important differences in structure and text.  In particular, the FCPA includes four categories of individuals who may be liable under its provisions but deliberately

excludes foreigners acting outside the United States—what the court characterized as a "single, obvious omission." *Id.* at 84-85.  On the other hand, as noted above, the Kingpin Act applies to "whoever" violates the provisions of the act by engaging in the prohibited transactions set forth in the law, 21 §§ U.S.C. 1904, 1906.  The plain text of the criminal enforcement provision of the Kingpin Act is clear and does not exclude non-U.S. persons operating abroad.  Moreover, whereas nearly the entire *Hoskins* decision focuses on the availability for the FCPA of "general statutes regarding conspiracy and accessorial liability," 902 F.3d at 77, the Kingpin Act contains its own vicarious liability provision, without any limitation with respect to the nationality of the defendant. 21 U.S.C. § 1904(c)(2); *Hoskins*, 902 F.3d at 84 (noting that the FCPA contains "no text that creates any liability whatsoever for the class of persons in question").  Thus, while in *Hoskins*, the structure and text of the FCPA militated strongly in the defendant's favor in demonstrating an "affirmative legislative policy," 902 F.3d at 83, to exclude non-U.S. persons operating abroad, here the opposite is true—namely, structure and text of the Kingpin Act manifest a clear intent to cover anyone who engages in the delineated transactions prohibited by the Kingpin Act, irrespective of nationality.

Notably, in reaching its conclusion that the FCPA does not reach non-citizens operating abroad, the court emphasized that the legislative history of the FCPA explicitly "provided protection for foreign persons," 902 F.3d at 86, and "that Congress was attuned to these risks and carefully delimited the statute accordingly," *id.* at 85.   Indeed, over the course of ten pages of the opinion, *see id.* at 85-95, the court reviewed the "several ways," *id.* at 93, that the legislative history makes clear that Congress deliberately excluded from liability the class of persons at issue in *Hoskins.*  As the court in *Hoskins* explained, Congress, in enacting the FCPA, "drew deliberate lines regarding the liability of foreign persons," *id.* at 89, and "demonstrated a conscious choice .

22

. . to avoid creating individual liability through use of the conspiracy and complicity statutes," *id.* at 94.  No such legislative history exists for the Kingpin Act.  To the contrary, the Kingpin Act's legislative history, as noted above, demonstrates Congress's determination to aggressively use the tools provided by the law (including vicarious liability) to target drug traffickers abroad and stands in stark contrast to the FCPA's extensive litigation history limiting the reach of the law to exempt foreigners.  The legislative history certainly does not support the defendant's argument that the Kingpin Act falls into the "narrowly circumscribed exception" to the "firm baseline rule" that "where the crime is so defined that only certain categories of persons . . . may commit the crime through their own acts, persons not within those categories can be guilty of conspiring to commit the crime or of the substantive crime itself as an accomplice."  902 F.3d at 77.  Once again, the defendant's reliance on *Hoskins* is misplaced.

Moreover, the cases relied upon by the *Hoskins* court—including *Gebardi v. United States*, 287 U.S. 112 (1932)—counsel in favor of the Kingpin Act reaching Lopez Bello's conduct.  The Supreme Court in *Gebardi* addressed whether a woman could conspire with her transporters to violate the Mann Act.  287 U.S. at 118.  The Court found that mere consent to the transportation was insufficient to convey liability but that a woman would "fall within the ban of the statute, if she 'aid[ed] or assist[ed]' someone else in transporting or in procuring transportation for herself." *Id.* at 119.  Applying that logic here, unlike a passive participant transported in violation of the Mann Act, Lopez Bello aided and assisted others in violating and evading OFAC's sanctions—by masterminding, directly benefitting from, and paying for the years-long charter flights scheme— and thus could be found liable under the Kingpin Act.

The defendant also cites *Gebardi* to argue that "Congress's decision not to place sanctioned persons within the ambit of the Kingpin Act's prohibitions"—especially "given that a sanctioned

23

person will inevitably be involved in every transaction or dealing that violates the Act"—amounts to a "conferral of immunity" to SDNTs.  (Def. Mem. 10-11).  But *Gebardi* and *Hoskins* both explicitly rejected that logic.  *See Gebardi*, 287 U.S. at 122 (finding that a woman who actively aids and abets her transportation can be held liable and not "rest[ing]" its "decision" on Wharton's rule, a common-law principle that an agreement between two people to commit a crime cannot be prosecuted as a conspiracy when the crime requires participation of two people); *Hoskins*, 902 F.3d at 82 (noting that "*Gebardi* explicitly stated that its reasoning was not based on Wharton's Rule," and explaining that the Supreme Court's Mann Act precedents do "not merely ask whether a woman would 'frequently if not normally' be present for violations of the Mann Act" but rather look to "Congress's policy in enacting the statute").  More pointedly, the defendant is not a victim of human trafficking but a sanctioned narcotics trafficker who conspired to circumvent Congress's sanctions through a sophisticated campaign of evasion and subterfuge.  And unlike in *Hoskins*, where the court found that the text, structure, and legislative history of the FCPA strongly evince an intent to exclude a specific class of individuals from the FCPA's reach, Lopez Bello falls squarely within the set of people whose conduct Congress sought to curtail in enacting the Kingpin Act—foreign drug traffickers abusing the U.S. and its financial system.  At bottom, the defense is asking the Court to accept that within the Kingpin Act lies an affirmative legislative policy barring enforcement of the Act's provisions against the very individuals the law was meant to combat.  (Def. Mem. 5-6).  Aside from contradicting the clear aim of the statute, it defies logic that Congress, in imposing a law to sanction narcotics traffickers, simultaneously sought to provide them a safe harbor, barring the Government from prosecuting their inevitable attempts to circumvent sanctions by enlisting U.S. persons or acting within the United States.

The defendant also invokes IEEPA in an effort to support his argument that the Kingpin Act only applies to U.S. persons.  (Def. Mem. 9-10).  But the comparison to IEEPA only further strengthens and confirms the applicability of the Kingpin Act to Lopez Bello and his offense conduct since both laws apply to foreigners conducting illicit transactions with U.S. persons or in the United States.  For one, both IEEPA and the Kingpin Act contain analogous criminal enforcement provisions that do not limit liability to U.S. persons.  *Compare* 50 U.S.C. § 1705(c) ("A person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) shall, upon conviction, be [guilty of a crime]."), *with*  21 U.S.C. § 1906(a) ("whoever willfully violates the provisions of [the Kingpin Act] . . .  shall be . . . [guilty of a crime].").  This consistency between the laws is unsurprising given that the "Kingpin Act was modeled on a specific, successful application of a similar statute, . . . IEEPA."  *Zevallos v. Obama*, 793 F.3d 106, 109-10 (D.C. Cir. 2015); *see also United States v. Oseguera Gonzalez*, 507 F. Supp. 3d 137, 153 (D.D.C. 2020) (rejecting attempt to distinguish IEEPA and the Kingpin Act because defendant "fail[ed] to provide any compelling reason to distinguish between the similar language in the statutes and their provisions defining violations thereof" and reasoning "that the kind of conduct prohibited by the Kingpin Act—dealings and transactions with OFAC-designated entities—is quite similar to the conduct that may be prohibited by regulation under the IEEPA—transactions with designated foreign countries or nationals found to pose unusual and extraordinary threat").

Conveniently ignoring the criminal enforcement provision, the defendant instead focuses on the list of prohibited transactions under the Kingpin Act, which, as outlined above, includes "[a]ny transaction or dealing by a United States person, or within the United States, in property or interests in property of" persons sanctioned under the Act, 21 U.S.C. § 1904(c)(1); and (2) "[a]ny

25

transaction or dealing by a United States person, or within the United States, that evades or avoids, or has the effect of evading or avoiding, and any endeavor, attempt, or conspiracy to violate, any of the prohibitions contained in the [Kingpin Act]," *id.* § 1904(c)(2).  The defendant's attempt to draw a contrast between these provisions and IEEPA fails for three reasons.  First, as noted above, the criminal enforcement provision of the Kingpin Act contains no language barring enforcement against foreigners operating abroad; to the contrary, the language—in contrast to other parts of the statute—makes clear that it applies to both U.S persons and non-U.S. persons.  Second, IEEPA, by its own terms, is limited to transactions "*subject to the jurisdiction of the United States*."  50 U.S.C. § 1702(a)(1)(A) (emphasis added).  Despite this limitation, non-U.S. persons operating outside the United States are routinely prosecuted under IEEPA.  The same holds true for the Kingpin Act; despite its transactions limitation, it still applies to foreigners and citizens alike. Furthermore, IEEPA expressly delegates authority to the Treasury Department to enforce IEEPA's disparate sanctions regimes.  Many of these sanctions regimes—including those targeting terrorists and Iranian sanctions evasion—contain limiting provisions mirroring those in the Kingpin Act and yet they have been found to apply to foreigners operating abroad.  For example, the defendant in *United States v. Zarrab*, No. 15 Cr. 867 (RMB), 2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016), was charged with, among other things, one count of conspiring to violate IEEPA and the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. §§ 560.202-205, in connection with a Turkey-based scheme to evade Iranian sanctions through payments processed in the United States.  Akin to the limits on transactions set forth in the Kingpin Act, the ITSR prohibits "the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran." 31 C.F.R. § 560.204.  The defendant there argued that as a non-U.S. person

operating exclusively from Turkey, he could not be held liable under this provision of the ITSR or under IEEPA, given the latter's requirement that the transaction involve property "subject to the jurisdiction of the United States." *Id.* at *5. The court rejected this argument, reasoning that "while Zarrab may not be a 'U.S. person' . . . , he may nonetheless be charged under the IEEPA and the ITSR which encompass conduct emanating 'from the United States,' and/or involves 'property [ ] subject to the jurisdiction of the United States.'" 2016 WL 6820737, at *10. So too, Lopez Bello, while not a U.S. person or physically present in the United States during the offense conduct, violated the Kingpin Act by engaging in prohibited transactions with U.S. persons and within the United States.

### C.  The Presumption Against Extraterritoriality Does Not Bar the Kingpin Act Counts

In an effort to escape liability for brazenly orchestrating a scheme to violate U.S. sanctions through clandestine flights into and out of the United States and surreptitiously transferring money to the United States to pay for those flights, Lopez Bello argues that the presumption against extraterritoriality precludes his charges under the Kingpin Act. (Def. Mem. 13-15). This argument is meritless.

First, the Indictment is not an extraterritorial application of the Kingpin Act. The fact that Lopez Bello lived and operated overseas during the period of the charges does not mean that applying the Kingpin Act to his conduct is "extraterritorial." Rather, because the Indictment involves a domestic, rather than extraterritorial, application of the Kingpin Act, the presumption against extraterritoriality does not apply. *See Pasquantino v. United States*, 544 U.S. 349, 371 (2005) (the "domestic element of petitioners' conduct is what the Government is punishing in this prosecution . . . ."); *see also Force v. Facebook*, 934 F.3d 53, 73 (2d Cir. 2019) (noting that "the case involves a domestic application of the statute . . . the conduct relevant to the statute's focus

occurred in the United States, [and] the case involves a permissible domestic application even if other conduct occurred abroad").  Lopez Bello and his co-conspirators used U.S-based planes, pilots, flight organizers, back-office employees, entities, bank accounts, and money transfers to evade OFAC's sanctions regulations.  Indeed, the transactions that are the subject of the Kingpin Act violations—illegal money flows to U.S. persons and entities (including to a company named *American* Charter Services) to pay for flights—all occurred in the United States.  Similarly, all of the charter flights at the center of the scheme were operated by Americans and U.S.-based flight service operators, most of the flights actually took off and landed in the United States, and the planes were largely N-registered aircraft.[6]  As noted above, Lopez Bello arranged and paid for these flights to depart and return to the United States—making stops abroad in between to transport Lopez Bello, El Aissami, and others in Maduro's inner circle to destinations of strategic importance to Maduro's regime as the global sanctions campaign against Venezuela tightened. Moreover, given that the very purpose of the flight scheme was to gain access to American private charter planes and U.S.-based travel services to be used internationally in violation of sanctions, this case involves a clear domestic application of the Kingpin Act.  *See United States v. Halkbank*, No. 15 Cr. 867 (RMB), 2020 WL 5849512, at *6 (S.D.N.Y. Oct. 1, 2020) (finding that the presumption against extraterritoriality did not apply to violations of IEEPA, among other statutes, where the Government alleged that "the very purpose of the scheme was to launder Iranian oil proceeds through U.S. financial institutions for use to make international payments throughout the world").  This Court recognized the domestic nature of Lopez Bello's scheme when, in sentencing one of Lopez Bello's co-defendants for conspiring to violate the Kingpin Act, it noted that the

---

[6] The Federal Aviation Administration issues a federal registration for all U.S. aircraft by assigning each aircraft an "N" number.

illegal flights—organized for Lopez Bello and others "in an effort to defeat the consequence of the sanctions"—used "charter services," "flights," and "the using of an organization, in effect, in line with airports and air services *in the United States*."  *United States v. Victor Mones Coro*, 19 Cr. 144 (AKH), 3/17/21 Sentencing Tr. at 18 (emphasis added).

Second, even if the Indictment were considered an extraterritorial application of the Kingpin Act (which it is not), there is no presumption against extraterritoriality here.  It is well settled that "Congress has the authority to 'enforce its laws beyond the territorial boundaries of the United States.'"  *United States v. Yousef*, 327 F.3d 56, 86 (2d Cir. 2003) (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)).  Although there is generally a presumption (subject to rebuttal) that statutes do not apply extraterritorially—both to avoid unnecessary international discord and because Congress typically is presumed to legislate with domestic concerns in mind, *see RJR Nabisco v. European Community*, 136 S. Ct. 2090, 2100 (2016)—this presumption "does not apply to those 'criminal statutes which are, as a class, not logically dependent on their locality for the Government's jurisdiction.'" *Yousef*, 327 F.3d at 86 (quoting *United States v. Bowman*, 260 U.S. 94, 98 (1922)); *see also Bowman*, 260 U.S. at 98 ("[T]o limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense."); *see also United States v. Vilar*, 729 F.3d 62, 72 (2d Cir. 2013) (The presumption against extraterritoriality does not apply where the law at issue is aimed at "protecting 'the right of the government to defend itself.'").  The Kingpin Act is an exercise of the government's right to defend the United States against foreign narco-traffickers

and falls within the class of criminal statutes that are not logically dependent on their locality for jurisdiction.  Moreover, the Kingpin Act was explicitly passed to counter foreign threats; Congress was not acting, as the presumption against extraterritoriality assumes, with solely domestic concerns in mind, and clearly was concerned principally with countering global narcotics traffickers posing a threat to the United States, rather than international comity.  *Cf. Epskamp*, 832 F.3d at 163 (holding that a similar jurisdictional provision in 21 U.S.C. § 959(b) "appears calibrated for broad extraterritorial application," even without express words to that effect)*; see Zarrab*, 2016 WL 6820737, at *8 (finding that presumption does not apply to the IEEPA and the ITSR since the "enactment and promulgation of the IEEPA and the ITSR reflect the United States' interest in protecting and defending itself against [various forms of Iranian aggression,] which implicate the national security, foreign policy, and the economy of the United States.").  Indeed, the very language of the Kingpin Act—in addition to the legislative history cited above—reflects its international focus and how the law was meant to protect the "national security, foreign policy, and economy of the United States."  21 U.S.C. § 1901(a)(2) ("There is a national emergency resulting from the activities of international narcotics traffickers and their organizations that threatens the national security, foreign policy, and economy of the United States."); 21 U.S.C. § 1901(a)(3) ("IEEPA was successfully applied to international narcotics traffickers in Colombia and based on that successful case study, Congress believes similar authorities should be applied worldwide."); 21 U.S.C. § 1902 ("The purpose of this chapter [of the Kingpin Act] is to provide authority for the identification of, and application of sanctions on a worldwide basis to, significant foreign narcotics traffickers, their organizations, and the foreign persons who provide support to those significant foreign narcotics traffickers and their organizations, whose activities threaten the national security, foreign policy, and economy of the United States.").

Third, even if the presumption against extraterritoriality applied, it would be roundly rebutted here. Where the presumption against extraterritoriality applies, "that presumption can be overcome when Congress clearly expresses its intent to do so." *Yousef*, 327 F.3d at 86. To determine whether Congress has "clearly manifested" its intent that a statute apply to extraterritorial conduct, courts should consider not only the language of the statute itself, but "all available evidence about the meaning" of the statute, including its text, structure, and legislative history. *United States v. bin Laden*, 92 F. Supp. 2d 189, 193 (S.D.N.Y. 2000) (quoting *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 177 (1993)); *see also Epskamp*, 832 F.3d at 164 ("Even assuming for the sake of argument that the text of § 959(b) itself is insufficiently plain to overcome the presumption against extraterritoriality, we conclude that the statutory scheme and the context of the statute overcome the presumption against extraterritoriality."). The extraterritorial focus of the Kingpin Act is apparent even from the title of the Act: Lopez Bello is charged with violating the *Foreign* Narcotics Kingpin Designation Act. The Kingpin Act was adopted for the express purpose of allowing the United States to respond to global drug trafficking threats—having their source in whole or substantial part *outside* the United States—to its "national security, foreign policy, and economy." 21 U.S.C. § 1902. *Cf. Epskamp*, 832 F.3d at 164 (holding that 21 U.S.C. § 959(b)(2) applies extraterritorially even without an explicit extraterritoriality provision because, among other things, reading the statute not to apply globally would "have the peculiar effect of establishing a purely domestic crime within a statute aimed at combatting narcotics smuggling and importation where every other provision applies extraterritorially"). Indeed, in sentencing one of Lopez Bello's co-conspirators, the Court recognized the global purpose of the Kingpin Act, noting that the law is "one of the most important tools" for "reduc[ing] the opportunities for bad conduct nation to nation," which in this case were imposed on leaders of a "country that is anathema to the

United States and imposes a dictatorship on its people and has ruined what once was a thriving democracy in South America and made it a failing government in a very evil dictatorship." *United States v. Victor Mones Coro*, 19 Cr. 144 (AKH), 3/17/21 Sentencing Tr. at 62.

Beyond the clear language in the Kingpin Act evincing extraterritorial application, the extraterritorial intent of the statute is similar to other anti-narcotics laws, which contain several provisions with extraterritorial reach, most of which contain no express language to that effect. Title 21, United States Code, Sections 841 and 846, for example, contain no language specifying their extraterritorial application; nevertheless, they prohibit, among other conduct, conspiring to distribute controlled substances in the United States even where no conduct in furtherance of the conspiracy takes place within United States territory. *See, e.g.*, *United States v. Orozco-Prada*, 732 F.2d 1076, 1087-88 (2d Cir. 1984) (upholding a conviction under 21 U.S.C. §§ 841(a)(1) and 846 where a vessel loaded with marijuana intended for distribution in the United States was intercepted in Colombian territorial waters). Likewise, 21 U.S.C. §§ 952 and 963, which prohibit importing and conspiring to import a controlled substance into the United States, contain no express extraterritoriality provision, but also apply to conduct outside the United States. *See, e.g.*, *United States v. Londono-Villa*, 930 F.2d 994 999-1000 (2d Cir. 1991) (recognizing Section 952's extraterritorial reach and interpreting the provision to require that the defendant knew or intended that the narcotics would be imported into the United States); *Chua Han Mow v. United States*, 730 F.2d 1308, 1311-12 (9th Cir. 1984) (applying 21 U.S.C. §§ 846 and 963 to conduct by a Malaysian citizen in Malaysia). Similar to the provisions of the Controlled Substances Act, the Kingpin Act is properly applied to persons who, though outside the United States, intend to cause prohibited conduct within it. *See also United States v. Al Kassar*, 660 F. 3d 108, 118-19 (2d Cir. 2011) (holding that 18 U.S.C. § 1114, which prohibits conspiring to kill U.S. officers or employees,

applies extraterritorially even though the statute does not contain an express extraterritoriality provision).

For the reasons outlined above, the defendant's arguments to dismiss the Kingpin Act Counts fail.

## II.      Lopez Bello's Motion to Dismiss the Conspiracy to Defraud the United States Charge (Count One) Should Be Denied

Finally, the defendant contends that Count One of the Indictment should be dismissed, claiming that (1) the Government does not properly allege a conspiracy under 18 U.S.C. § 371, and (2) the defendant's conduct took place outside the United States and so Count One is barred by the presumption against extraterritoriality.  (Def Mem. 15-20).  Both arguments are meritless.

First, with respect to the defendant's statutory argument, "it is now well established that § 371 'is not confined to fraud as that term has been defined in the common law,' but reaches 'any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government.'"  *United States v. Coplan*, 703 F.3d 46, 61 (2d Cir. 2012) (quoting *Dennis v. United States*, 384 U.S. 855, 861 (1966)).  The elements of this type of Section 371 offense—commonly called a "*Klein* conspiracy" after its progenitor *United States v. Klein*, 247 F.2d 908 (2d Cir. 1957)—are clear: "(1) [that the defendant] entered into an agreement (2) to obstruct a lawful function of the government (3) by deceitful or dishonest means and (4) at least one overt act in furtherance of the conspiracy."  *United States v. Ballistrea*, 101 F.3d 827, 832 (2d Cir. 1996) (quoting *United States v. Caldwell*, 989 F.2d 1056, 1059 (9th Cir. 1993)).  And contrary to defense counsel's assertions that *Klein* conspiracies rest on shaky legal footing (Def. Mem. 17-18), the Second Circuit has time and again affirmed the "expansive reading of § 371."  *Coplan*, 703 F.3d at 62 (internal quotation marks omitted); *United States v. Atilla*, 966 F.3d 118, 131 (2d Cir. 2020) (rejecting analogous challenge and noting the "long-lived Supreme Court decisions that

33

have definitively adopted and reaffirmed the expansive reading of § 371 given by courts") (internal quotation marks omitted); *United States v. Liu*, No. 19 Cr. 804 (VEC), 2022 WL 443846, at *3 (S.D.N.Y. Feb. 14, 2022), *aff'd*, No. 22-1082, 2022 WL 14177192 (2d Cir. Oct. 25, 2022) (rejecting several challenges to *Klein* conspiracy).

It is therefore unsurprising that the Second Circuit has routinely upheld *Klein* conspiracy convictions premised on similar conduct—impairing, obstructing, and defeating the lawful functions of agencies of the U.S. Government. For example, in *United States v. Nersesian*, 824 F.2d 1294, 1313 (2d Cir. 1987), the court upheld a conviction under Section 371 based on the defendants' structuring of transactions of over $10,000 into smaller $1,000 increments in order to evade currency transaction reporting ("CTR") requirements. Even though an "individual bank customer had no duty to report transactions over $10,000," the court concluded that "[t]he IRS has an interest in receiving CTRs from financial institutions when customers arrange transactions in excess of $10,000. In order for this lawful governmental function to operate, it is imperative that reports be submitted by financial institutions. If [the defendant] and his associates agreed to interfere with and to obstruct this lawful function of the IRS, they could properly be charged with a violation of the 'defraud prong' of § 371." *Id*. at 1313.

Similarly, in *United States v. Mancuso*, 428 F. App'x 73 (2d Cir. 2011), the Second Circuit affirmed a defendant's conviction for preparing a power of attorney that enabled a co-defendant— who, due to prior conviction, was not allowed to work in the asbestos business—to continue in that industry by allowing him to "impersonat[e]" a sham owner who was not banned. *Id.* at 80. The court concluded that "the power of attorney impaired government functions by hiding [the co-defendant]'s involvement in illegal asbestos practices from regulators scrutinizing him after his federal conviction." *Id.*

And in *United States v. Atilla*, the Second Circuit affirmed the defendant's conviction "for conspiracy to obstruct the United States' enforcement of economic sanctions laws," in connection with a scheme to undermine OFAC's enforcement of controls targeting Iran.  966 F.3d at 130.  *See also United States v. Shellef*, 507 F.3d 82, 105 (2d Cir. 2007) (defendants guilty of *Klein* conspiracy where they misled manufacturers about the taxable status of their transactions, which the manufacturers had a duty to report to the IRS); *United States v. Nejad*, No. 18 Cr. 224 (AJN), 2019 WL 6702361, at *10 (S.D.N.Y. Dec. 6, 2019) (denying motion to dismiss defraud clause charge in *Klein* conspiracy to "impair[ ] or imped[e] [OFAC's] enforcement of economic sanctions against Iran").

Thus, far from "stretch[ing] the defraud clause beyond any defensible limit" (Def. Mem. 18), Lopez Bello and his co-conspirators are charged with conduct within the heartland of *Klein* conspiracy cases in this Circuit.  Indeed, "all that is necessary is that the scheme had the object of making it more difficult for the [government agency, *i.e.*, OFAC] to carry out its lawful functions and that the scheme depend on 'dishonest or deceitful means.'"  *Shellef*, 507 F.3d at 104.  *United States v. Liu*, No. 22-1082, 2022 WL 14177192, at *4 (2d Cir. Oct. 25, 2022) ("A conspiracy to defraud under section 371 embraces 'any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government.'").  The Indictment makes clear that the defendant is alleged to have "defraud[ed] the United States by impairing, obstructing, and defeating the lawful functions of the Treasury Department and OFAC."  (*See* Ind. ¶ 14).  As the Indictment makes plain, the defendant "used U.S.-based companies and to charter private flights, including at times on U.S.-registered aircraft."  (*See* Ind. ¶ 3).   In doing so, the defendant and his co-conspirators took steps to evade both OFAC's enforcement of  sanctions and detection by law enforcement, including ceasing flights into and outside the United States for the designated

Venezuelan leaders (*United States v. Mones Coro*, 19 Cr. 144 (AKH), Pre-Sentence Investigation Report ("PSR") ¶ 24), and employing a wide range of clandestine steps to mask their illicit conduct, including the use of code names, encrypted messaging applications, cash payments, a front company, and falsified flight manifests and invoices (*id.* ¶¶ 32, 34).  Furthermore, the defendant deceitfully paid for these illegal services in the United States, including by using shell companies to pay millions of dollars through U.S.-based financial institutions, smuggling bulk cash into the United States (Ind. ¶ 4), and making an illegal in-kind payment in the form of an aircraft  (PSR ¶ 29).  In paying for these illegal flight services using deceitful means, Lopez Bello willfully concealed information knowing that screening functions implemented by banks seeking to comply with OFAC regulations would block the transactions in which he was engaging, and thereby explicitly obstructed the lawful function of OFAC regulations.  *See United States v. Bilzerian*, 926 F.2d 1285, 1302 (2d Cir. 1991) (evidence of defendants' "mere failure to comply with a regulatory requirement to provide information" was sufficient to sustain conviction).  Just as in *Nersesian Mancuso* and *Atilla,* Lopez Bello conspired to deceitfully evade and conceal material information from U.S. regulators, in this case OFAC, and thus, is properly charged with a *Klein* conspiracy under Section 371.

Unable to displace clear Second Circuit law establishing the broad application of *Klein* conspiracies or undermine the Treasury Department's obvious interest in preventing violations of its sanctions, Lopez Bello pivots his argument to contend that not "every violation of sanctions" is "a 'fraud' on OFAC" and that interpreting *Klein* conspiracies in this manner would render "the offense clause mere surplusage."  (Def. Mem. 19).  But the Government need not prove—or even argue—that every violation of sanctions constitutes a *Klein* conspiracy to defeat the defendant's arguments on this score.  Rather, the facts of this case—which are replete with instances of Lopez

Bello and his co-conspirators impairing, frustrating, and obstructing OFAC's ability to enforce its sanctions—clearly fall within the range of conduct prescribed by Section 371. *See United States v. Rosengarten*, 857 F.2d 76, 79 (2d Cir. 1988) ("A conspiracy to frustrate or obstruct the IRS's function of ascertaining and collecting income taxes falls clearly within the ban of section 371.").

Nor is Count One "a clear end-run around the Kingpin Act's limitations," as Lopez Bello claims. (Def. Mem. 19). As discussed above, *Klein* conspiracies are regularly charged in the Circuit and constitute a separate criminal charge—containing separate offense elements—from a substantive offense or a conspiracy to violate a specific substantive offense. Here, Lopez Bello's conduct constituted both violations of the Kingpin Act and its regulations, as outlined above, but also a violation of Section 371, in that he impaired and obstructed OFAC's lawful functions in using deceitful means to carry out and hide his illegal conduct. Aside from the facts presented here clearly establishing a *Klein* conspiracy, accepting Lopez Bello's argument would amount to a rejection of decades of clear Second Circuit law by essentially excising the defraud clause from Section 371.

Next, Lopez Bello reiterates his claims of extraterritoriality, asserting that Section 371 cannot be applied to his case because "the clause does not apply to foreign conduct." (Def. Mem. 19). This argument—which does not cite a single case where a court invalidated a *Klein* conspiracy on grounds of extraterritoriality—fails for several reasons.

As an initial matter, because the object of the obstruction was in the United States—namely to obstruct the lawful functions of a U.S. agency operating in the United States—the statute is not being applied extraterritorially. *See Pasquantino*, 544 U.S. at 371 (The "domestic element of petitioners' conduct is what the Government is punishing in this prosecution, no less than when it prosecutes a scheme to defraud a foreign individual or corporation, or a foreign government acting

as a market participant.").  As described above, the defendant and his co-conspirators engaged in a sophisticated campaign to undermine and obstruct OFAC—including the use of code names, falsified flight manifests and invoices for flights on U.S. planes piloted by Americans, communication over encrypted messaging applications, cash flown into the United States from Venezuela, and wire transfers to U.S. banks—nearly all of which occurred within the United States.  The Court should therefore deny Lopez Bello's motion to dismiss on this score.  *See Zarrab*, 2016 WL 6820737, at *4 (rejecting analogous argument in case where domestic nexus was merely causing wire transfers to traverse American banks); *United States v. Budovsky*, No. 13 Cr. 368 (DLC), 2015 WL 5602853, at *4-5 (S.D.N.Y. Sept. 23, 2015) (rejecting analogous argument and finding "sufficient nexus with the United States . . . [including that the defendant] moved $13.5 million from a Costa Rican bank account held by [the exchange company] through a correspondent bank account in the Southern District of New York").

Furthermore, even if the Court were to accept Lopez Bello's description of the offense conduct as "extraterritorial," which it is not as explained above, the presumption still would not bar Count One since a conspiracy to defraud the United States by "obstructing or defeating the lawful function of any department of Government," *Dennis*, 384 U.S. at 861, is by definition a crime that afflicts "the right of the Government to defend itself against obstruction, or fraud wherever perpetrated," *Bowman*, 260 U.S. at 98, and therefore is "not logically dependent on [its] locality for the Government's jurisdiction," *id. See Vilar*, 729 F.3d at 73 (concluding that the presumption against extraterritoriality does not apply to situations "where the law at issue is aimed at protecting 'the right of the government to defend itself'"); *see also United States v. Gatlin*, 216 F.3d 207 (2d Cir. 2000) ("Statutes prohibiting crimes against the United States government may be applied extraterritorially even in the absence of 'clear evidence' that Congress so intended.").

Notably, courts have consistently found that the "defraud" prong of Section 371 applies extraterritorially.  *See United States v. Cotten*, 471 F.2d 744, 750 (9th Cir. 1973) (concluding that "conspiracy to defraud or to perpetrate crimes against this nation . . . . applies extraterritorially"); *United States v. Buck*, 2017 WL 4174931, at *7 (S.D.N.Y. 2017) ("[T]he Court finds that Section 371 has extraterritorial application in this case insofar as statutes prohibiting crimes against the United States government may be applied extraterritorially even in the absence of 'clear evidence' that Congress so intended[.]"); *Cockerham v. Willis*, No. 15 Civ. 382 (PRM), 2016 WL 345590, at *4 (W.D. Tex. Jan. 27, 2016), *aff'd*, 671 F. App'x 348 (5th Cir. 2016) (noting that "conspiracy to defraud the United States, in violation of 18 U.S.C. § 371" has "extraterritorial reach").  Here, the alleged conspiracy is directed at an agency of the United States, namely OFAC, and thus Section 371 may be applied extraterritorially.

In an argument relegated to a footnote, Lopez Bello claims *Bowman*—and by extension *Vilar*—is no longer good law.  (Def. Mem. 20, n.12).  Not so.  Lopez Bello points to no binding or non-binding case law abrogating *Vilar*.  To the contrary, courts in this district—including in rulings post-dating the Supreme Court's holdings in *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010), *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 118 (2013), and *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325 (2016)—continue to cite *Vilar* for the proposition that the presumption against extraterritoriality does not apply where the law is aimed at protecting the right of the government to defend itself.  *See, e.g.*, *Buck*, 2017 WL 4174931, at *7 (citing *Vilar* and noting that "none of the [recent Supreme Court] decisions refers to *Bowman* or calls the holding of that case into question"); *Zarrab*, 2016 WL 6820737, at *8 (quoting *Vilar* for the contention that the presumption against extraterritoriality is inapplicable for statutes "aimed at protecting the right of the government to defend itself"); *United States v. Georgescu*, 148 F. Supp. 3d 319, 323

(S.D.N.Y. 2015) (same).  Accordingly, no presumption against extraterritoriality applies, and Lopez Bello's motion to dismiss should be denied.

## CONCLUSION

Lopez Bello is a fugitive from justice who continues to hide out in Venezuela protected by a murderous regime he has helped prop up.  For the reasons outlined in the Government's prior brief, the Court should decline to consider Lopez Bello's motion until he submits to its jurisdiction. Even if the Court elects to reach the merits of Lopez Bello's motion, it should deny the motion for the reasons outlined above.  Lopez Bello violated the Kingpin Act and Section 371 by masterminding an illegal flight scheme using U.S. planes, pilots, companies, back-office staff, and bank accounts to avoid U.S. sanctions.  Lopez Bello's motion to dismiss should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
Sam Adelsberg
Assistant United States Attorney
Tel.: (212) 637-2494

Dated: January 13, 2022
        New York, New York